# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-1148

_____

Leymis Carolina Velasquez; Sandra Ortiz

*Plaintiffs - Appellees*

v.

William P. Barr, Attorney General of the United States; Chad F. Wolf, Acting Secretary, Department of Homeland Security; Robert M. Cowan, Director, National Benefits Center, U.S. Citizenship and Immigration Services; Leslie Tritten, Director, St. Paul Field Office, U.S. Citizenship and Immigration Services; U.S. Citizenship and Immigration Services; U.S. Department of Homeland Security; Lee Cissna, Director, U.S. Citizenship and Immigration Services; Donald Neufeld, Associate Director, Service Center Operations, U.S. Citizenship and Immigration Services

*Defendants - Appellants*

------------------------------

American Immigration Council; American Immigration Lawyers Association; Northwest Immigrant Rights Project

*Amici on Behalf of Appellee(s)*

_____

No. 19-2130

_____

Gilma Geanette Melgar; Aurelia Concepcion Martinez

*Plaintiffs - Appellees*

v.

William P. Barr, Attorney General of the United States; Chad F. Wolf, Acting Secretary, Department of Homeland Security; Lee Cissna, Director, U.S. Citizenship and Immigration Services; Donald Neufeld, Associate Director, Service Center Operations, U.S. Citizenship and Immigration Services; Robert M. Cowan, Director, National Benefits Center, U.S. Citizenship and Immigration Services; Leslie Tritten, Director, St. Paul Field Office, U.S. Citizenship and Immigration Services; U.S. Citizenship and Immigration Services; U.S. Department of Homeland Security

*Defendants - Appellants*

------------------------------

American Immigration Lawyers Association; American Immigration Council; Northwest Immigrant Rights Project

*Amici on Behalf of Appellee(s)*

_____

Appeals from United States District Court
for the District of Minnesota

_____

Submitted: February 13, 2020
Filed: October 27, 2020

_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

In these consolidated cases, Appellants (collectively, the government) appeal the district courts'[1] adverse grants of summary judgment. These cases present the same question of statutory interpretation: whether a noncitizen who entered this country without inspection or admission but later received Temporary Protected Status (TPS) may adjust her status to Lawful Permanent Resident (LPR), when an LPR application requires the noncitizen to have been "inspected and admitted" into the United States. See 8 U.S.C. § 1255(a). The district courts in both cases decided the answer is yes: a TPS recipient is deemed "inspected and admitted" and so may adjust her status. After considering the statutory scheme at issue, we affirm.

## I. Background

These cases concern two provisions of the Immigration and Nationality Act (INA): the designation of TPS under 8 U.S.C. § 1254a, and the adjustment of status to LPR under 8 U.S.C. § 1255(a). The first provision, § 1254a, authorizes the Attorney General to grant TPS to noncitizens from countries experiencing armed conflict, natural disaster, or other extraordinary circumstances. 8 U.S.C. § 1254a(b)(1)(A)–(B). Individuals with TPS receive temporary protection from removal and authorization to work. Id. § 1254a(a)(1)–(2). TPS has other positive consequences. Relevant here, "for purposes of adjustment of status under section 1255," a TPS beneficiary "shall be considered as being in, and maintaining, lawful status as a nonimmigrant." Id. § 1254a(f)(4).

The second provision, § 1255, governs the adjustment of status to LPR. As a threshold matter, § 1255 requires an applicant to have been "inspected and admitted" into the United States before she can adjust her status. Id. § 1255(a). This provision also bars several classes of persons from adjustment, including certain noncitizens "in

---

[1]The Honorable Donovan W. Frank and the Honorable Joan N. Ericksen, United States District Judges for the District of Minnesota.

unlawful immigration status on the date of filing the application for adjustment of status" and those who have "failed . . . to maintain continuously a lawful status since entry into the United States." Id. § 1255(c)(2).

The parties disagree as to whether a grant of TPS satisfies § 1255(a)'s threshold "inspected-and-admitted" requirement. Appellees contend that the plain language of § 1254a(f)(4) means that TPS beneficiaries are considered "inspected and admitted" for purposes of § 1255(a). The government disagrees, asserting that because § 1254a(f)(4) does not specifically include § 1255(a)'s "inspected-and-admitted" language, a TPS beneficiary must be separately inspected and admitted to adjust her status under § 1255.

Appellees are TPS beneficiaries whose LPR applications were denied by U.S. Citizenship and Immigration Services (USCIS). Aurelia Concepcion Martinez is a citizen of Honduras who entered the United States without inspection in 1996. After the Attorney General designated Honduras as a TPS country in 1999, she applied for and received TPS. Gilma Geanette Melgar, Sandra Ortiz, and Leymis Carolina Velasquez are citizens of El Salvador who entered the United States without inspection in 1992, 1993, and 2000, respectively. After the Attorney General designated El Salvador as a TPS country in 2001, they applied for and received TPS.

After becoming TPS beneficiaries, Appellees applied to adjust their status to LPR based on having immediate relatives who are United States citizens. USCIS requested evidence of lawful admission pursuant to 8 U.S.C. § 1255(a). Appellees provided proof of their TPS and a copy of Bonilla v. Johnson, 149 F. Supp. 3d 1135 (D. Minn. 2016), where the district court decided a grant of TPS satisfies § 1255(a)'s "inspected-and-admitted" requirement. Id. at 1142. USCIS nevertheless denied Appellees' adjustment applications, asserting that TPS is not an "admission" for purposes of § 1255(a). USCIS told Appellees there was no administrative appeal, so they brought two separate lawsuits under the Administrative Procedure Act (APA)

-4-

in the United States District Court for the District of Minnesota. <u>See</u> 5 U.S.C. § 706(2)(A).

The district courts in both cases decided that, based on the INA's unambiguous language, a grant of TPS satisfies § 1255(a)'s "inspected-and-admitted" requirement. This is because TPS recipients are considered inspected and admitted for purposes of § 1255. <u>See</u> 8 U.S.C. § 1254a(f)(4). The district courts found USCIS's contrary interpretation unlawful, reversed its denial of the LPR applications, and granted summary judgment to Appellees. The government timely appealed.

## II. Discussion

This court has not yet decided whether TPS recipients who entered the United States without inspection are nevertheless deemed "inspected and admitted" and thus eligible for adjustment of status under 8 U.S.C. § 1255(a). There is a split of authority on the issue. <u>Compare</u> <u>Sanchez v. Sec'y U.S. Dep't of Homeland Sec.</u>, 967 F.3d 242, 251–52 (3d Cir. 2020) (holding that a noncitizen who receives TPS is not deemed "inspected and admitted"), <u>petition for cert. filed</u>, No. 20-315 (U.S. Sept. 10, 2020), <u>and</u> <u>Serrano v. U.S. Att'y Gen.</u>, 655 F.3d 1260, 1265 (11th Cir. 2011) (per curiam) (same), <u>with</u> <u>Ramirez v. Brown</u>, 852 F.3d 954, 959 (9th Cir. 2017) (holding that, because a TPS recipient must be treated as a nonimmigrant for adjustment purposes, she is deemed to have met all requirements for nonimmigrant status, including inspection and admission), <u>and</u> <u>Flores v. USCIS</u>, 718 F.3d 548, 552–53 (6th Cir. 2013) (same).

## A.

We review de novo the grant of summary judgment, including questions of statutory interpretation. <u>Rajasekaran v. Hazuda</u>, 815 F.3d 1095, 1098 (8th Cir. 2016). Under the APA, courts must set aside an agency decision that is "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing an agency decision, we apply the two-step analysis from Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See Ortega-Marroquin v. Holder, 640 F.3d 814, 818 (8th Cir. 2011). First, we determine "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. At this step, we consider "the language [of the statute] itself, the specific context in which that language is used, and the broader context of the statute as a whole." Lovilia Coal Co. v. Harvey, 109 F. 3d 445, 449 (8th Cir. 1997) (cleaned up). If the statute's meaning is clear, then both the courts and agencies "must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842–43. If, however, we determine that the statute is ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. Courts may defer to an agency interpretation even when the agency does not exercise its formal rule-making authority. Skidmore v. Swift & Co., 323 U.S. 134, 139–40 (1944); see United States v. Mead Corp., 533 U.S. 218, 228 (2001) (explaining that Skidmore deference requires courts to consider agency consistency, along with other factors that have the power to persuade, including the validity of the agency's reasoning).

**B.**

To adjust their status to LPR under 8 U.S.C. § 1255, Appellees must have been "inspected and admitted" into the United States. See 8 U.S.C. § 1255(a). The INA elsewhere defines "admitted" to mean "the lawful entry . . . into the United States after inspection and authorization by an immigration officer." Id. § 1101(a)(13)(A). The parties disagree on whether TPS satisfies § 1255(a)'s "inspected-and-admitted" requirement.

Under 8 U.S.C. § 1254a, the Attorney General may designate certain nationals of a foreign state as eligible for TPS. TPS beneficiaries may "temporarily remain in

and work in the United States" while their home country is covered by the TPS program. De Leon-Ochoa v. Att'y Gen., 622 F.3d 341, 344 (3d Cir. 2010). And "for purposes of adjustment of status under section 1255," a TPS beneficiary "shall be considered as being in, and maintaining, lawful status as a nonimmigrant." 8 U.S.C. § 1254a(f)(4).

Employing the "traditional tools of statutory construction" at Chevron step one, see Chevron, 467 U.S. at 843 n.9, we conclude that § 1254a(f)(4) unambiguously requires that TPS recipients be considered "inspected and admitted" for purposes of adjusting their status under § 1255. Section 1254a(f)(4) mandates that TPS beneficiaries "shall be considered as being in, and maintaining, lawful status as a *nonimmigrant*" for purposes of § 1255. 8 U.S.C. § 1254a(f)(4) (emphasis added). And an individual cannot gain nonimmigrant status without being considered inspected and admitted. That is, by the express provisions of the INA, (1) every person with lawful status as a nonimmigrant has been "admitted" into the United States, and (2) all nonimmigrants are "inspected" before admission.

More specifically, § 1184(a)(1) provides that "[t]he admission to the United States of any [noncitizen] as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe . . . ." 8 U.S.C. § 1184(a)(1); see also id. § 1182(d)(1) ("Nothing in this section shall be regarded as prohibiting the [government] from instituting removal proceedings against [a noncitizen] admitted as a nonimmigrant . . . for conduct or a condition . . . not disclosed to the Attorney General prior to the [noncitizen]'s admission as a nonimmigrant . . . ."). Accordingly, a nonimmigrant is by definition "admitted" to the United States. In turn, the "admission" of a nonimmigrant necessarily means that they were also "inspected." This is because the INA defines "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." Id. § 1101(a)(13)(A). Indeed, the INA consistently treats inspection as a prerequisite to admission. See id. § 1225(a)(1) (an

-7-

"alien present in the United States . . . shall be deemed . . . an applicant for admission"); id. § 1225(a)(3) (all "applicants for admission . . . shall be inspected by immigration officers"); id. § 1184(b) (every noncitizen "shall be presumed to be an immigrant until he establishes to the satisfaction of . . . the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status"). See also 8 C.F.R. § 214.1(a)(3)(i) (a "nonimmigrant['s] . . . admission to the United States is conditioned on compliance with any inspection requirement"). From these provisions, it is clear that a noncitizen who has been granted nonimmigrant status has necessarily been inspected and admitted. And because TPS beneficiaries are "considered" to have nonimmigrant status for purposes of § 1255, they must also be considered "inspected and admitted" under § 1255(a). See 8 U.S.C. § 1254a(f)(4); see also Gomez v. Lynch, 831 F.3d 652, 661 (5th Cir. 2016) (recognizing that, "in select circumstances, admission will be imputed or deemed by operation of law").

The government disagrees with this conclusion. It begins by distinguishing between two separate requirements for adjustment of status: (1) admission and inspection under § 1255(a); and (2) lawful status under § 1255(c)(2).[2] The terms "admission" and "lawful status" mean different things. See, e.g., Gomez, 831 F.3d at 658 (describing "admission" and "status" as "fundamentally distinct concepts"). The government argues that, to meet the first requirement, a person must satisfy the formal definition of "admission," which requires a "lawful entry . . . into the United States." See 8 U.S.C. § 1101(a)(13)(A). Under this reading, TPS beneficiaries who entered this country without inspection are not "admitted" because they did not "lawfully" enter the United States. The government maintains that § 1254a(f)(4) satisfies only the second condition for adjustment of status—that an applicant have lawful status under § 1255(c)(2)—and does not establish that the applicant was

_____

[2]Recall that 8 U.S.C. § 1255(c)(2) precludes adjustment eligibility for certain noncitizens "in unlawful immigration status on the date of filing the application for adjustment of status or who ha[ve] failed . . . to maintain continuously a lawful status since entry into the United States."

inspected and admitted. This has some superficial appeal, given that both § 1254a(f)(4) and § 1255(c)(2) use the phrase "lawful status." See id. § 1254a(f)(4) (TPS beneficiary "shall be considered as being in, and maintaining, *lawful status* as a nonimmigrant" (emphasis added)). And, as the government notes, one can have lawful status in this country without being admitted. See, e.g., Matter of V-X-, 26 I. & N. Dec. 147 (BIA 2013) (holding that a grant of asylee status is not an "admission").

However, the government's argument conflicts with the INA's text. It overlooks meaningful differences between the language used in § 1254a(f)(4) and § 1255(c)(2). Compare 8 U.S.C. § 1254a(f)(4) ("*being in*, and maintaining, lawful status *as a nonimmigrant*" (emphasis added)), with id. § 1255(c)(2) ("maintain continuously a lawful status since entry into the United States"). The TPS statute does not track § 1255(c)(2), and there is no indication that TPS satisfies only the lawful-status requirement in that subsection. Rather, § 1254a(f)(4) unambiguously applies to § 1255 in its entirety, not just § 1255(c)(2). See id. § 1254a(f)(4) ("for purposes of adjustment of status under *section 1255* of this title" (emphasis added)); see also Milner v. Dep't of Navy, 562 U.S. 562, 573 (2011) (ruling against "taking a red pen to the statute—cutting out some words and pasting in others" (cleaned up)). And by including the word "nonimmigrant" in § 1254a(f)(4), Congress required that TPS recipients be treated as nonimmigrants when they apply to adjust their status under § 1255. As explained above, this means they are considered "inspected and admitted."

Additionally, Congress enacted § 1255 with the title, "Adjustment of status of *nonimmigrant* to that of person admitted for permanent residence." 66 Stat. 163, 164, 217 § 245 (1952) (emphasis added). This title aids in resolving that § 1254a(f)(4)'s direction to treat TPS recipients as "being in, and maintaining, lawful status as a nonimmigrant," satisfies § 1255(a)'s threshold requirement. See INS v. Nat'l Ctr. for

<u>Immigrants' Rights, Inc.</u>, 502 U.S. 183, 189 (1991) (explaining that "the title of a statute or section can aid in resolving an ambiguity in the legislation's text").

Not satisfied with the connection between "nonimmigrant" status and "inspection and admission," the government lodges several additional arguments against our conclusion. We consider each in turn.

First, the government notes that Congress has provided express exceptions to § 1255(a)'s "inspected-and-admitted" requirement, and TPS is not listed.[3] <u>See</u> 8 U.S.C. § 1255(h), (i). However, there is no reason for Congress to expressly exempt TPS beneficiaries from § 1255(a)'s requirements, given the plain language in § 1254a(f)(4). <u>See</u> <u>Ramirez</u>, 852 F.3d at 963 (explaining "there is no requirement that Congress draft an elegant statute").

Second, the government relies on what it suggests is § 1254a(f)(4)'s purpose: "to bridge the gap created when [a noncitizen], who was admitted at a port of entry as a nonimmigrant, later applies for and accepts TPS, but then falls out of the status provided by the previous nonimmigrant admission." As amici curiae note, this would allow only a small number of TPS grantees to benefit from § 1254a(f)(4)'s

---

[3]The dissent takes a similar position, concluding this is a case of statutory silence that results in ambiguity for purposes of <u>Chevron</u>, thus requiring us to determine whether the agency's construction of the statute is a permissible one. Respectfully, we disagree. The determination of whether a statute is "silent or ambiguous" requires looking not only at the "particular statutory language at issue," but also at "the language and design of the statute as a whole." <u>Fort Stewart Schs. v. Fed. Lab. Rels. Auth.</u>, 495 U.S. 641, 645 (1990). Here, the INA is neither silent nor ambiguous because the statutory scheme–and the way in which the relevant terms are used throughout–makes it plain that TPS beneficiaries satisfy § 1255(a)'s threshold requirement. This conclusion no doubt involves an intricate comparative analysis of the pertinent provisions of the statute. But on this issue, the statute is unambiguous nevertheless.

protections. As support for its narrow view of the statute's scope, the government cites a 1991 legal opinion from the former Immigration and Naturalization Service, issued after the TPS statute became law. See generally INS Genco Op. No. 91-27, 1991 WL 1185138 (INS Mar. 4, 1991); see also Matter of H-G-G-, 27 I. & N. Dec. 617 (AAO 2019).[4] At least one other court has rejected the government's proposed narrow purpose as inconsistent with § 1254a(f)(4)'s text, which indicates that the provision "benefits all TPS grantees." Ramirez, 852 F.3d at 962. In any event, we need not resolve this dispute over purpose because the statutory language is unambiguous. See NLRB v. SW Gen., Inc., 137 S. Ct. 929, 942 (2017) (explaining that where "[t]he text is clear," courts "need not consider this extra-textual evidence").

Third, the government argues that § 1254a(f)(4) does not confer *actual* nonimmigrant status on TPS beneficiaries; rather, it merely *considers* them as nonimmigrants for adjustment purposes. This is based on § 1254a(f)(4)'s instruction

---

[4]The dissent urges deference to Matter of H-G-G-, a decision of the Administrative Appeals Office (AAO) of the U.S. Department of Homeland Security that addressed this very issue and arrived at a contrary conclusion. We are not persuaded. As the dissent notes, it is not clear whether Matter of H-G-G- is in fact precedential and binding on the Executive Office for Immigration Review, and thus, whether it is subject to Chevron deference at all. In any event, because the statute unambiguously treats TPS recipients as "inspected and admitted" for purposes of § 1255(a)'s threshold requirement, Matter of H-G-G- is contrary to law. Moreover, the AAO's explanation that "[w]hile it is true that inspection and admission generally lead to lawful immigration status, it does not follow that having a lawful status results in one's inspection and admission" is not particularly helpful. Recall that under § 1254a(f)(4), a TPS beneficiary "shall be considered as being in, and maintaining, lawful status as *a nonimmigrant*" for purposes of § 1255. 8 U.S.C. § 1254a(f)(4) (emphasis added). So while the AAO is right that having lawful status does not necessarily result in inspection and admission—as demonstrated by the asylum example—this does not answer the question of whether lawful status *as a nonimmigrant* means having been inspected and admitted. We conclude that it does.

-11-

that TPS beneficiaries "shall be *considered as* being in, and maintaining, lawful status as a nonimmigrant." 8 U.S.C. § 1254a(f)(4) (emphasis added). According to the government, it is therefore irrelevant that all nonimmigrants are inspected and admitted into the United States. Because TPS beneficiaries are not *actual* nonimmigrants, they are not "inspected and admitted" under § 1255(a).

This argument misses the mark. Although not all TPS beneficiaries have been admitted at a port of entry, Congress used the term "considered" to create a legal fiction for adjustment purposes. A TPS beneficiary must be treated as a nonimmigrant under § 1255 even if she has not in fact met all requirements for nonimmigrant status. Inspection and admission are two of those requirements. See id. § 1184 ("Admission of nonimmigrants"). Other parts of the INA similarly use the term "consider" to create a legal fiction. See, e.g., id. § 1152(b)(3) (providing that, under certain circumstances, a noncitizen born in the United States "shall be considered as having been born in the country of which he is a citizen or subject"); id. § 1101(g) (a noncitizen under final order of removal who has already left the United States "shall be considered to have been . . . removed in pursuance of law"). Because TPS beneficiaries are "considered" nonimmigrants for § 1255 purposes, they are considered "inspected and admitted" under § 1255(a), regardless of how they entered the country. See, e.g., Gomez, 831 F.3d at 659 n.9 (recognizing categories of "legally fictional admissions").

The government's position that TPS beneficiaries must be "admitted" within the INA's strict port-of-entry definition falters even on its own terms. We have explained that the INA "inconsistently" uses the words "admitted" and "admission." Roberts v. Holder, 745 F.3d 928, 932 (8th Cir. 2014). Indeed, the adjustment statute itself uses "admission" inconsistently with the port-of-entry definition when it states that "the Attorney General shall record the [noncitizen]'s lawful *admission* for permanent residence" as the date the adjustment application is approved, rather than as the date of "lawful entry . . . into the United States," as § 1101(a)(13)(A) would

-12-

require.  See 8 U.S.C. § 1255(b) (emphasis added).  The government gives no reason for why the meaning of "admitted" in § 1255(a) cannot also depart from the formal port-of-entry definition.  And Roberts—which ruled that "admitted" and "admission" in the INA need not be read strictly to mean a port-of-entry admission—is an important precedent for this court.  745 F.3d at 932.

Finally, the government urges us to adopt the Eleventh Circuit's reasoning in Serrano, which held that, although a TPS beneficiary "has 'lawful status as a nonimmigrant' for purposes of adjusting his status," this "does not change § 1255(a)'s threshold requirement that he is eligible for adjustment of status only if he was initially inspected and admitted."  See Serrano, 655 F.3d at 1265.  We are not persuaded.  Rather than "change" the prerequisites for adjustment under § 1255(a), § 1254a(f)(4) deems the TPS recipient to have met them.  The Eleventh Circuit's decision did not acknowledge the meaning of "nonimmigrant" under 8 U.S.C. § 1184 or discuss the implication of obtaining lawful status as a nonimmigrant.  We believe this analysis is incomplete.  See Yates v. United States, 574 U.S. 528, 537 (2015) (instructing that courts must consider the "specific context in which the [statutory] language is used," in addition to the "language [of the statute] itself"); Lovilia Coal Co., 109 F.3d at 449.  We instead agree with the reasoning of the Sixth and Ninth Circuits, which have since examined the meaning of nonimmigrant status and held that the INA's plain language requires TPS beneficiaries to be considered "inspected and admitted" under § 1255(a).  See Ramirez, 852 F.3d at 959; Flores, 718 F.3d at 552–53.[5]

_____

[5]We note that the Third Circuit recently agreed with the Eleventh Circuit and decided that TPS recipients must satisfy the strict port-of-entry definition of "admission" to meet § 1255(a)'s threshold requirement.  Sanchez, 967 F.3d at 251 & n.6.  Respectfully, we disagree.  The Sanchez court relied on Third Circuit precedent that requires the terms "admission" and "admitted" to strictly mean a port-of-entry admission.  Id. at 245–46, 250 (citing Hanif v. Att'y Gen., 694 F.3d 479, 485 (3d Cir. 2012)).  This rule conflicts with our decision in Roberts, 745 F.3d at 932.  Moreover,

In sum, § 1254a(f)(4) provides that TPS recipients "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for purposes of adjusting their status under § 1255. 8 U.S.C. § 1254a(f)(4). Those in nonimmigrant status are necessarily inspected and admitted. By operation of § 1254a(f)(4), then, TPS recipients are considered "inspected and admitted" under § 1255(a), regardless of whether they entered the United States without inspection. USCIS's contrary interpretation conflicts with the plain meaning of the INA and is therefore unlawful. See 5 U.S.C. § 706(2)(A). We affirm the district courts' judgments.

LOKEN, Circuit Judge, dissenting.

I respectfully dissent. This case raises an important issue -- whether 8 U.S.C. § 1254a(f)(4) allows a noncitizen who entered this country without inspection or admission but was later granted Temporary Protected Status (TPS) to adjust her status to Lawful Permanent Resident under 8 U.S.C. § 1255. As the court acknowledges, there is already a conflict in the circuits on this question. Compare Ramirez v. Brown, 852 F.3d 954, 956 (9th Cir. 2017), and Flores v. USCIS, 718 F.3d 548, 553 (6th Cir. 2013), with Sanchez v. Sec'y of Homeland Sec., 967 F.3d 242, 251-52 (3d Cir. 2020), and Serrano v. U.S. Att'y Gen., 655 F.3d 1260, 1265 (11th Cir. 2011); see also Melendez v. McAleenan, 928 F.3d 425, 429 (5th Cir.), cert. denied, 140 S. Ct. 561 (2019). This makes eventual review by the Supreme Court quite likely. See Sup. Ct. R. 10(a).

I conclude the court has misapplied Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984), and Supreme Court decisions applying Chevron. It also all-but-ignores

the Sanchez court narrowly focused on the "lawful-status" language in § 1254a(f)(4) without fully addressing the meaning of "lawful status *as a nonimmigrant*." 8 U.S.C. § 1254a(f)(4) (emphasis added). This distinction is crucial because nonimmigrant status signifies an inspection and admission.

Matter of H-G-G-, 27 I. & N. Dec. 617, 641 (AAO 2019), a precedential decision in which the Administrative Appeals Office (AAO) of the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, concluded that 8 U.S.C. § 1254a(f)(4) does not satisfy 8 U.S.C. § 1255(a)'s threshold admission requirement.[6] Although interpretation of these provisions of the Immigration and Nationality Act (INA) is ultimately a question for the courts, I conclude the AAO's decision in H-G-G- is "based on a permissible construction of the statute" and therefore should be followed. Chevron, 467 U.S. at 843. "[I]f the law does not speak clearly to the question at issue, a court must defer to the [AAO's] reasonable interpretation, rather than substitute its own reading." Scialabba v. De Osorio, 573 U.S. 41, 57 (2014) (plurality opinion); id. at 79 (Roberts, C.J., concurring) (upholding the agency's reasonable interpretation because "Congress did not speak clearly" to the issue). I would therefore reverse the decisions of the district court.[7]

Congress enacts many complex statutes which the federal courts must interpret if called upon to do so by an actual case or controversy. "When a court reviews an agency's construction of the statute which it administers . . . [i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency,

[6]The AAO exercises appellate review of the decisions of USCIS officers. USCIS, AAO Practice Manual ch. 1.4(a). The Attorney General has authorized the AAO to issue precedential decisions that bind future adjudications involving the same issue. See 8 C.F.R. § 103.3(c). Though the USCIS stated that H-G-G- was an "adopted" decision, the Executive Office for Immigration Review in the Department of Justice lists H-G-G- as a precedential decision. As the Attorney General's opinion controls, I will treat H-G-G- as precedential. See 8 U.S.C. § 1103(a)(1).

[7]The applicant in H-G-G- brought an action in the District of Minnesota seeking judicial review of the AAO's decision under the Administrative Procedure Act. On September 28, the court granted summary judgment for the applicant, agreeing with the Ninth Circuit in Ramirez and the Sixth Circuit in Flores that the AAO's decision was arbitrary and capricious. Hernandez de Gutierrez v. Barr, No. 19-CV-02495, 2020 WL 5764281 at *6 (D. Minn. Sept. 28, 2020).

-15-

must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43.  However, "if the statute *is silent or ambiguous* with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Id. at 843 (emphasis added).  The court here, like too many others, ignores the explicit inclusion of statutory silence in defining whether an agency decision must be afforded deference.  The Supreme Court has repeatedly stated that "silent or ambiguous" is the governing standard.  See, e.g., Barnhart v. Walton, 535 U.S. 212, 218 (2002); I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999).  The inclusion is highly significant, for "silence, after all, normally creates ambiguity.  It does not resolve it."  Barnhart, 535 U.S. at 218.  If a statute "does not speak with the precision necessary to say definitively whether it applies . . . [t]his is the very situation in which we look to an authoritative agency for a decision about the statute's scope . . . [and] ask only whether the department's application was reasonable."  United States v. Eurodif S.A., 555 U.S. 305, 319 (2009).  A unanimous Court adhered to this principle in Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 53 (2011), where the Court noted that "[t]he principles underlying our decision in Chevron apply with full force in the tax context."  Id. at 55.

These principles apply with equal if not greater force to questions of statutory interpretation arising under the INA.  See, e.g., Aguirre-Aguirre, 526 U.S. at 424; Ortega-Marroquin v. Holder, 640 F.3d 814, 818 (8th Cir. 2011).  Indeed, the INA expressly provides that "determination and ruling by the Attorney General with respect to all questions of law shall be controlling."  8 U.S.C. § 1103(a)(1); see Nielsen v. Preap, 139 S. Ct. 954, 959 n.2 (2019); Bobadilla v. Holder, 679 F.3d 1052, 1054 (8th Cir. 2012).[8]  "[J]udicial deference to the Executive Branch is especially

---

[8]Congress further provided in 6 U.S.C. § 522 that nothing in 8 U.S.C. § 1103 "shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General."

-16-

appropriate in the immigration context because of its impact on foreign relations."
Birdsong v. Holder, 641 F.3d 957, 959 (8th Cir. 2011), quoting Aguirre-Aguirre, 526
U.S. at 425.

I agree with the "Background" discussion of the statute at issue and the
procedural history of these appeals in Part I. of the court's opinion. Plaintiffs were
denied adjustment of status under 8 U.S.C. § 1255 because they failed to satisfy the
initial eligibility requirement in § 1255(a):

> The status of an alien *who was inspected and admitted or paroled into*
> *the United States* . . . may be adjusted by the Attorney General, in his
> discretion and under such regulations as he may prescribe, to that of an
> alien lawfully admitted for permanent residence . . . .

(Emphasis added.) As I understand its essential reasoning, the court's decision that
plaintiffs satisfied this statutory element is based on the following propositions. (i)
Because 8 U.S.C. § 1254a(f)(4) provides that "TPS beneficiaries are 'considered'
nonimmigrants for § 1255 purposes, they are considered 'inspected and admitted'
under § 1255(a), regardless of how they entered the country . . . . Rather than
'change' the prerequisites for adjustment under § 1255(a), § 1254a(f)(4) deems the
TPS recipient to have met them." *Infra* p.12-13. (ii) "[T]here is no reason for
Congress to expressly exempt TPS beneficiaries from § 1255(a)'s requirements, given
the plain language in § 1254a(f)(4)." *Infra* p. 10. (iii) "[W]e need not resolve [a]
dispute over purpose because the statutory language is unambiguous." *Infra* p.11.
(iv) "Because the statute unambiguously treats TPS recipients as 'inspected and
admitted' for purposes of § 1255(a)'s threshold requirement, Matter of H-G-G- is
contrary to law." *Infra* p.11 n.4.

In <u>H-G-G-</u>, the AAO explained that Congress enacted TPS in November 1990[9] to protect two groups of aliens who entered the United States under different circumstances -- Chinese nationals who were admitted under temporary student visas but faced threats if they returned after the Chinese government suppressed protests in Tiananmen Square, and refugees who entered the country illegally from countries experiencing internal strife such as El Salvador and Liberia. <u>H-G-G-</u>, 27 I. & N. Dec. at 624-25. In March 1991, the General Counsel of the Immigration and Naturalization Service (USCIS's predecessor) issued an opinion declaring that an individual in the latter group was barred from adjustment of status by § 1255(a) because "an alien who entered without inspection, by definition, cannot satisfy this requirement." <u>Id.</u> at 621. Later that year, the INS published TPS regulations, declining to adopt a public comment asserting that aliens granted TPS should be allowed to adjust status "regardless of how they entered the United States." <u>Id.</u>, citing Temporary Protected Status, 56 Fed. Reg. 23491, 23495 (May 22, 1991); <u>see</u> I.N.S. Genco, Op. 91-27, 1991 WL 1185138, at *2 (I.N.S. Mar. 4, 1991). The agency has maintained this position ever since, and Congress has not addressed the issue, despite amending § 1255(a) several times in the interim. <u>H-G-G-</u>, 27 I. & N. Dec. at 629.

Expressly disagreeing with contrary decisions of the Sixth and Ninth Circuits, the AAO concluded that the TPS statutory provision at issue, § 1254a(f)(4), "does not provide for the inspection, admission, or parole of an alien," <u>id.</u> at 626, whether the statute is unambiguous, as the AAO and every circuit to consider the issue has concluded, or is construed as containing "some ambiguity," in which case <u>Chevron</u> requires deference if the agency has adopted a reasonable construction. 467 U.S. at 844. On its face, the AAO reasoned, § 1254a(f)(4) does not provide for inspection, admission, or parole "as the terms are entirely absent." "[U]se of the phrase 'considered as being in and maintaining' lawful status serves as implicit recognition

<hr />

[9]Immigration Act of 1990, Pub. L. No. 101-649 § 244A, 104 Stat. 4978, 5035 (enacted on November 29, 1990).

that the individual is not in fact in such status." <u>H-G-G-</u>, 27 I. & N. Dec. at 626. Properly construed, the statute "does not confer a broad remedy for prior immigration violations, but instead serves a limited and specific purpose: it maintains the status quo, ensuring that individuals who maintained a lawful immigration status prior to TPS [such as those admitted under short-term student or visitor visas] are not penalized if that status expires during the time in which they are in TPS." <u>Id.</u> at 627. The AAO concluded that congressional silence, while "not always determinative," makes clear "that Congress had an intention on the precise question at issue," quoting <u>Negusie v. Holder</u>, 555 U.S. 511, 518 (2009). "If Congress intended to deem a grant of TPS to constitute an admission or parole for adjustment or change of status purposes, it could have included language akin to that of [§ 1255(h)(1)], clarifying that a special immigrant juvenile . . . 'shall be deemed, for purposes of [§ 1255(a)] to have been paroled into the United States.'" <u>H-G-G-</u>, 27 I. & N. Dec. at 628.

The AAO also directly addressed the court's assertion, essential to its decision, that "every person with lawful status as a nonimmigrant has been 'admitted' into the United States." *Infra* p.7. "While it is true that inspection and admission generally lead to lawful immigration status," the AAO explained, "it does not follow that having a lawful status results in one's inspection and admission . . . . For example, a grant of asylum places the individual in valid immigration status but is not an 'admission.'" <u>H-G-G-</u>, 27 I. & N. Dec. at 634-35. "[N]either the language of [§ 1254a(f)(4)] nor the legislative history of TPS suggests that Congress had any intent to waive the requirements of lawful admission and maintenance of lawful status for those who did not meet them in the first instance." <u>Id.</u> at 636-37.

For the same reasons, the AAO concluded that "even if the statute is ambiguous, the most reasonable reading of [§ 1254a(f)(4)] is that it does not render a beneficiary 'inspected and admitted or paroled' for purposes of adjusting to permanent resident status." <u>Id.</u> at 640. The AAO then concluded:

Upon consideration of the plain language [of § 1254a(f)(4)], its construction, its operation in the larger statutory scheme, its legislative history, and its application by the agency charged with its administration since its inception, we would follow USCIS's and the former INS's long-standing interpretation. Accordingly, under either a plan [sic] language or ambiguity analysis, the end result is the same -- TPS is not an admission for purposes of [§ 1255(a)] of the [INA]

Id. at 641.

In my view, we should follow the AAO's decision in H-G-G- because, like the BIA decision upheld by a unanimous Court in Holder v. Martinez Gutierrez, the AAO's lengthy opinion:

expressed the [agency's] view, based on its experience implementing the INA, that statutory text, administrative practice, and regulatory policy all pointed in one direction: toward disallowing [the requested cancellation of removal under 8 U.S.C. § 1229b(a)]. In making that case, the decision reads like a multitude of agency interpretations . . . to which we and other courts have routinely deferred.

566 U.S. 583, 597-98 (2012).

Viewing the Chevron deference issue more broadly, this case requires us to determine the proper interplay between adjustment-of-status and TPS provisions in the INA. It is not a case where "[t]he language and punctuation Congress used" can only be read one way. United States v. Ron Pair Enter., Inc., 489 U.S. 235, 242 (1989). Rather, considering "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole," both sides of the circuit conflict put forth plausible interpretations of the impact of the language Congress used in § 1254a(f)(4) on other provisions of the INA. Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997).

In a case where agency deference is *not at issue,* such as <u>Robinson</u>, the Supreme Court routinely concludes that the statute is ambiguous and proceeds to resolve the ambiguity. <u>Id.</u> at 345. Here, agency deference is at issue. In <u>Chevron</u>, the deference issue turned on whether Congress had left a regulatory "gap" for the agency to fill. Here, there is not a regulatory gap. Rather, the issue is how an explicit regulatory "directive" to the agency should be interpreted. In this situation, dividing the deference question into two categorical extremes -- unambiguous means no deference; ambiguous means nearly total deference -- has produced recurring debate in the lower courts and has stretched use of the term "silent or ambiguous" in the <u>Chevron</u> opinion beyond its customary role in construing a statute. Focusing on the results in analogous cases, rather than on the reasoning in individual opinions, the Supreme Court has consistently deferred to plausible, well-considered agency interpretations, particularly when complex statutes such as the INA or the Internal Revenue Code are being interpreted. But in applying <u>Chevron</u>, the conflicting opinions in cases such as <u>Scialabba</u> and <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001), persuade me that further clarification of the paradigmatic two-step <u>Chevron</u> analysis in this type of case would be helpful. But that is not the function of a court of appeals. In this case, like the AAO I conclude that, no matter how the question of ambiguity is resolved, the agency's long-standing interpretation of the INA as explained in <u>H-G-G-</u> is worthy of substantial deference under <u>Chevron</u> and is persuasive.

Accordingly, I respectfully dissent.

_____

-21-